2003 OK 72

Paul **TIBBETTS**, Erwin Olds, Mary Dittemeyer, Mary Pittman, on behalf of themselves and all others similarly situated, Plaintiffs/Appellees,

v.

**SIGHT 'N SOUND APPLIANCE CENTERS, INC.,** an Oklahoma Corporation, d/b/a Sight 'n Sound & Cost Warehouse, Defendant/Appellant.

No. 96,079.

Supreme Court of Oklahoma.

Sept. 16, 2003.

As Corrected Sept. 16, 2003.

---

David Humphreys and Luke Wallace of Humphreys Wallace Humphreys, Tulsa, OK, and Justin LaMunyon of Faulkner & LaMunyon, P.L.L.C., Enid, OK, for Plaintiffs/Appellees.

Craig L. Box and Julia C. Rieman of Gungoll, Jackson, Collins, Box & Devoll, P.C., Enid, OK, for Defendant/Appellant.

LAVENDER, J.:

¶ 1 We decide here if the trial judge erred in awarding $375,000.00 in attorney fees to plaintiffs/appellees in their class action suit brought against defendant/appellant, Sight 'n Sound Appliance Centers, Inc., d/b/a Sight 'n Sound & Cost Warehouse under the Oklahoma Consumer Protection Act (OCPA), 15 O.S.1991, § 751 et seq., as amended.[1] We hold the trial judge erred, and the Court of Civil Appeals (COCA), Division I mistakenly affirmed, because the only reasonable attorney fee in this case is no fee, plaintiffs seeking **solely** money damages, but recovering **zero** damages (i.e., **nothing**) via a jury verdict. We also overrule *Tibbetts v. Sight 'n Sound Appliance Centers, Inc. (Tibbetts I )*, 2000 OK CIV APP 47, 6 P.3d 1064 (*cert. denied* 3–30–00), a prior COCA, Division IV opinion involving the same case, as it wrongly held these private plaintiffs may recover attorney fees in this OCPA case merely by showing a violation of the OCPA without an

---

1. The current version of the Oklahoma Consumer Protection Act (OCPA), of course, may be found at 15 O.S.2001, § 751 et seq., as amended.

attendant showing of damages or actual injury.

¶ 2 This Court's decision in *Walls v. American Tobacco Co.*, 2000 OK 66, 11 P.3d 626, followed shortly by *Patterson v. Beall*, 2000 OK 92, 19 P.3d 839, held that for a private plaintiff to have a viable claim under the OCPA the plaintiff must show as an essential element of the claim, actual damages, i.e., injury in fact. To the extent plaintiffs argue *Tibbetts I* is the law of the case such that the propriety of at least some attorney fee award may not now be challenged as they have been determined to be the prevailing/successful parties by *Tibbetts I*, we hold an exception to the law of the case doctrine applies as *Tibbetts I* is palpably erroneous and a gross or manifest injustice would be done were we to allow the award for fees to stand when it is clearly not authorized by law and plaintiffs cannot be deemed to have prevailed because they recovered nothing.

## PART I. STANDARD OF REVIEW.

¶ 3 What constitutes a reasonable attorney fee is a matter addressed to the sound discretion of the trial court to be decided based on various factors and a judgment awarding attorney fees will not be reversed absent an abuse of discretion. *Continental Natural Gas, Inc. v. Midcoast Natural Gas, Inc.*, 1996 OK CIV APP 157, 935 P.2d 1185, 1188; *see also State ex rel. Burk v. City of Oklahoma City*, 1979 OK 115, 598 P.2d 659, 663 (review standard is abuse of discretion when reasonableness of attorney fees awarded is issue on appeal). As a general matter, an abuse of discretion review standard includes appellate examination of both fact and law issues [*Christian v. Gray*, 2003 OK 10, ¶ 43, 65 P.3d 591, 608] and abuse occurs when the ruling being reviewed is based on an erroneous legal conclusion or there is no rational basis in the evidence for the decision. *Fent v. Oklahoma Natural Gas, Co.*, 2001 OK 35, ¶ 12, 27 P.3d 477, 481; *Abel v. Tisdale*, 1980 OK 161, 619 P.2d 608, 612 (reversal for abuse of discretion proper if trial judge makes clearly erroneous conclusion and judgment, against reason and evidence).

¶ 4 Further, when an assigned error is one of law a *de novo* review standard applies [*Christian v. Gray, supra,* 2003 OK 10, at ¶ 43, 65 P.3d at 608], a non-deferential, plenary and independent review of the trial court's legal ruling. *Samman v. Multiple Injury Trust Fund,* 2001 OK 71, ¶ 8 and n. 5, 33 P.3d 302, 305 and n. 5. Though normally when reviewing the reasonableness of an attorney fee award an appellate court affords the trial judge's finding(s) much deference because of the nature of the factual inquiry into the factors delineated in *State ex rel. Burk v. City of Oklahoma City, supra,* in that here the overriding and critical factor of the results obtained is undisputed and leads to only **one** rational conclusion as to what a reasonable fee should be (i.e., no fee), the ultimate decision in this case turns on a question of law.

## PART II. PROCEDURAL AND FACTUAL BACKGROUND.

¶ 5 The Pre–Trial Conference Order (PTO)[2] filed in the lower court in August

**2.** Rule 5(I) of the Rules for District Courts of Oklahoma, 12 O.S.2001, Ch.2, App., Rules 1 et seq., as amended, provides:

> **I. Pretrial–Orders.** After any conference held pursuant to this rule, an order shall be entered reciting the action taken. **This order shall control subsequent course of the action unless modified by a subsequent order. The order following a final pretrial conference shall be modified only to prevent manifest injustice.** The form adopted by the Oklahoma Supreme Court for pretrial conference orders shall be used by the District Court. If the judge deviates from the form, he or she shall in writing show to the Supreme Court the reasons for such deviation.
>
> The pretrial order shall include the results of the conference and advice to the court regarding the factual and legal issues, including details of material evidence to be presented. The order shall also present all questions of law in the case. All exhibits must be marked, listed and identified in the pretrial order. If there is objection to the admission of any exhibits, the grounds for the objection must be specifically stated. Absent proper objection, the listed exhibit is admitted when offered at trial or other proceeding. Attorneys for all parties will approve the order. The order shall be presented to the District Court for signature. **The contents of the pretrial order shall supersede the pleadings and govern the trial of the case unless departure therefrom is permitted by the Court to prevent manifest injustice.** Proposed pretrial order shall not be filed. (Emphasis added to body.)

1997 indicates plaintiffs contended defendant's conduct violated the OCPA, § 753(8), (9) and (12). Subsection 12 details prohibited conduct of bait and switch advertising, accompanied by various forms of behavior concerning not selling or supplying the product advertised. Subsections 8 and 9, respectively, declare unlawful advertising, knowingly or with reason to know, a product with intent not to sell it as advertised or with intent not to supply the reasonably expected public demand unless the ad discloses a limitation of quality.[3] Basically, plaintiffs' case, as presented to the jury, centered on the advertising of Magnavox television sets, but then steering the customer to another brand of television, i.e., Goldstar. *Tibbetts I*, 2000 OK CIV APP 47, at ¶3, 6 P.3d at 1066–1067.[4] Although plaintiffs' initial October 1994 petition had requested injunctive relief to prohibit defendant from continuing to violate the OCPA, the PTO—which controlled the subsequent course of the action—unequivocally sets forth that plaintiffs sought **solely** monetary relief—i.e., damages—both compensatory and punitive. Two of plaintiffs' attorneys, in effect, voiced their view at the attorney fee hearing held after remand from *Tibbetts I*, that the OCPA does not permit injunctive relief in a private consumer action and the request for injunctive relief was abandoned.

¶6 After the case was tried, the jury was instructed on the law and provided three verdict forms: a defendant's verdict form which generally allowed the jury to find the issues in favor of defendant; a plaintiffs' verdict form generally allowing the jury to find in favor of the plaintiffs and to fix the amount of damages to the class as a whole; and a punitive damage verdict form. Nine members of the jury signed the plaintiffs' verdict form, but it unequivocally fixed the amount of damages at **zero**. The same nine jurors signed the punitive damage verdict form and it fixed the amount of punitive damages at zero. Based on these verdicts we must assume the jury found defendant did engage in some violation of the OCPA,

The identical provision existed in August 1997 when the Pre Trial Conference Order (PTO) noted in the text was filed in the trial court. 12 O.S.1991, Ch.2, App., Rule 5(I).

3. Title 15 O.S.Supp.2002, § 753(8)(9) and (12) provide:

A person engages in a practice which is declared to be unlawful under the [OCPA] ... when, in the course of the person's business, the person:

\* \* \*

8. Advertises, knowingly or with reason to know, the subject of a consumer transaction with intent not to sell it as advertised;

9. Advertises, knowingly or with reason to know, the subject of a consumer transaction with intent not to supply reasonably expected public demand, unless the advertisement discloses a limitation of quantity;

\* \* \*

12. Employs "bait and switch" advertising, which consists of an offer to sell the subject of a consumer transaction which the seller does not intend to sell, which advertising is accompanied by one or more of the following practices:

a. refusal to show the subject of a consumer transaction advertised,

b. disparagement of the advertised subject of a consumer transaction or the terms of sale,

c. requiring undisclosed tie-in sales or other undisclosed conditions to be met prior to selling the advertised subject of a consumer transaction,

d. refusal to take orders for the subject of a consumer transaction advertised for delivery within a reasonable time,

e. showing or demonstrating defective subject of a consumer transaction which the seller knows is unusable or impracticable for the purpose set forth in the advertisement,

f. accepting a deposit for the subject of a consumer transaction and subsequently charging the buyer for a higher priced item, or

g. willful failure to make deliveries of the subject of a consumer transaction within a reasonable time or to make a refund therefor upon the request of the purchaser[.]

The August 1997 PTO, Plaintiff's [sic] Contentions, cites to § 752(8), (9) and (12) of the OCPA. Section 752 is the definition section of the OCPA. Obviously, the PTO contains a typographical error, as the bait and switch (or related) provisions sued under are found in § 753(8), (9) and (12) of the OCPA. The part of the PTO setting out defendant's Grounds For Defense correctly refers to § 753. Section 753 was the subject of amendment after the filing of plaintiffs' initial trial court petition in October 1994 and after the jury trial was held in early 1998. We quote from the 2002 Oklahoma Statutes as the pertinent subsections remain the same as in 1994. *See* 1996 Okla. Sess. Laws, Ch. 8, § 3; 1999 Okla. Sess. Laws, Ch. 175, § 3; 2001 Okla. Sess. Laws, Ch. 260, § 1; 2002 Okla. Sess. Laws, Ch. 296, § 3.

4. The PTO identifies the class certified as all those that purchased 19″ or 25″ Goldstar Televisions from defendant between January 1, 1993 through December 31, 1994.

but that plaintiffs failed to carry their burden to show any damages.[5] Judgment was entered by the trial judge, awarding plaintiffs nothing. The issue of attorney fees was reserved for proper application.

¶ 7 Both sides, plaintiffs and defendant, moved for attorney fees and the trial judge denied both requests. Each side appealed the denials and the COCA, Division IV in *Tibbetts I*, in effect, decided that language employed in § 761.1(A) of the OCPA allowed plaintiffs to recover attorney fees merely by showing a violation of the OCPA without an attendant showing of damages or actual injury. *Tibbetts I* remanded for the trial judge to determine the amount of attorney fees. This Court denied defendant's quest for certiorari to review *Tibbetts I*, the matter returned to the trial court, and after various written submissions of the parties concerning the attorney fee issue and an evidentiary hearing, the trial judge entered the award of $375,00.00 in favor of plaintiffs now before us.[6]

¶ 8 The $375,000.00 fee was arrived at by the trial judge upon a determination that the reasonable amount of plaintiffs' attorneys' time was 3000 hours and that a reasonable hourly rate for the lawyers involved was an average of $125.00 per hour.[7] Plaintiffs' attorneys had initially sought over 1 million dollars in attorney fees and the record contains evidence that said attorneys may actually have spent 7000 hours in attorney's time

on the case. We also note the record is undisputed that plaintiffs' agreement with their counsel as to attorney fees is a contingency-based agreement, i.e., plaintiffs have no responsibility to pay their counsel attorney fees as nothing was recovered. Further, the Findings of Fact and Conclusions of Law (FF/CL) that accompanied the trial court "Judgement" awarding the fees under review, indicates that the amount in controversy in this case was never clearly established, but would not have exceeded $25.00 per class member, a sum that would not have exceeded $500,000.00 for the class as a whole. Evidence presented at the attorney fee hearing, however, seems to reveal plaintiffs sought about 1 million dollars in compensatory damages from the jury, i.e., apparently about $50.00 per class member.

¶ 9 Defendant appealed the award and the COCA, Division I affirmed, though it appeared to recognize that *Tibbetts I's* holding that plaintiffs were entitled to attorney fees merely because they had shown a violation of the OCPA was no longer good law in light of this Court's decision in *Walls, supra*, to the effect that an essential element of a private OCPA claim is actual damages. Division I's opinion determined it was powerless to reverse *Tibbetts I*, essentially in deference to the law of the case doctrine, and decided the amount awarded did not manifest an abuse of discretion.[8] We previously granted certiora-

---

5. Nothing in the jury's verdict definitively reveals the extent to which it found defendant to have violated the OCPA nor does the decision in *Tibbetts v. Sight 'n Sound Appliance Centers, Inc.* (*Tibbetts I*), 2000 OK CIV APP 47, 6 P.3d 1064 (*cert. denied* 3–30–00).

6. The trial court's March 7, 2001 "Judgement", in addition to awarding plaintiffs $375,000.00 in attorney fees against defendant, awarded them $39,910.95 in costs. As we read its appeal and certiorari submissions, neither on appeal nor certiorari does defendant seek reversal of costs awarded. Further, the trial judge's Findings of Fact and Conclusions of Law (FF/CL)(that accompanied the "Judgement") set out that the parties stipulated that reasonable appellate attorney fees and costs associated with the prior appeal in *Tibbetts I, supra*, note 5, were $3,108.75 and $558.00, respectively, and same were affixed at said amounts. In this Court's March 30, 2000 Order denying certiorari in *Tibbetts I* this Court also granted plaintiffs' motion for appeal-and

certiorari-related attorney fees and remanded to the trial court for hearing as to the proper amount. Defendant does not challenge said Order here and, as we read its appeal merit briefs and certiorari submissions, it does not seek reversal of the $3,108.75 representing appellate attorney fees associated with *Tibbetts I*. Also, as we view the record, the appellate attorney fees specified in the FF/CL are not included in the $375,000.00, the latter figure being separately specified in both the FF/CL and "Judgement".

7. The trial judge's FF/CL also make it clear he considered the applicability of other factors delineated in *Oliver's Sports Center, Inc. v. National Standard Ins. Co.*, 1980 OK 120, 615 P.2d 291 and *State ex rel. Burk v. City of Oklahoma City*, 1979 OK 115, 598 P.2d 659.

8. The opinion of the Court of Civil Appeals also cited 20 O.S.1991, § 30.14(B) for its lack of authority to reexamine *Tibbetts I, supra*, note 5. Title 20 O.S.2001, § 30.14(B)—as the 1991 version did—provides in pertinent part:

ri and we now vacate the COCA's opinion, reverse the trial court judgment of $375,000.00 attorney fees in favor of plaintiffs and overrule *Tibbetts I*.

## PART III. THE ONLY REASONABLE ATTORNEY FEE IN THIS CASE, WHERE PLAINTIFFS SOUGHT SOLELY MONEY DAMAGES AND RECOVERED NOTHING, IS NO FEE.

¶ 10 We first note that our review of the reasonableness of the fee awarded requires no exception to the law of the case doctrine because *Tibbetts I* did not decide the reasonableness issue. Generally, as applicable here, the law of the case doctrine provides that an appellate court's decision on an issue of law becomes the law of the case once the decision is final, in all subsequent stages of the litigation. *Matter of Estate of Severns*, 1982 OK 64, 650 P.2d 854, 856. To properly apply the law of the case doctrine the appellate court in the second appeal must decide exactly what the first appellate decision determined expressly or impliedly. *Shoemaker v. Estate of Freeman*, 1998 OK 17, ¶ 15, 967 P.2d 871, 875. *Tibbetts I* decided that certain language in § 761.1(A) of the OCPA allowed **plaintiffs** to recover their attorney fees by showing involvement in a covered transaction with defendant and some violation of the OCPA on defendant's part in regard thereto without a showing of any actual damages. *Tibbetts I*, 2000 OK CIV APP 47, at ¶¶ 9–10, 6 P.3d at 1066–1067. *Tibbetts I* neither expressly nor impliedly decided what a reasonable attorney fee would be in this case, nor did it direct the trial judge in any particular way as to what weight to give appropriate factors in reaching the reasonableness issue on remand. Furthermore, it must be kept in mind that it is undisputed here that plaintiffs' attorney fee agreement with their counsel was contingency-based, i.e., **plaintiffs** owe their counsel no attorney fees for bringing this case as

Each division of the Court of Civil Appeals convened under the authority of this act shall have jurisdiction to determine or otherwise dispose of any case assigned to it by the Supreme Court, and its decisions, when final, shall be neither appealable to the Supreme Court nor be subject to reexamination by another division of the Court of Civil Appeals or by the Judges of that Court sitting en banc.

nothing was recovered. We now consider the reasonableness issue.

¶ 11 This Court has foreshadowed the proper decision in this case for we have recognized the importance of the relationship between the amount sued for in a case seeking only money damages and the results obtained. *Southwestern Bell Telephone Co. v. Parker Pest Control, Inc.*, 1987 OK 16, 737 P.2d 1186, 1188–1189; *see also Arkoma Gas Co. v. Otis Engineering Corp.*, 1993 OK 27, 849 P.2d 392, 394–395 (what is a reasonable attorney fee in each case must be considered in light of the extent to which plaintiff prevailed). Although, of course, there is no mathematical formula which can be applied in every situation as to gauging the reasonableness of a fee when considering the relationship between the amount sued for and the amount recovered, in our view, no rational argument can be made that a $375,000.00 attorney fee award is reasonable when counsel recovers **absolutely no monetary relief** for the client where the suit seeks approximately 1 million dollars, and **only** monetary relief is sought. The only reasonable fee here, as a matter of law, is no fee at all.

¶ 12 The United States Supreme Court in *Farrar v. Hobby*, 506 U.S. 103, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992), was faced with a somewhat analogous situation. In *Farrar* the plaintiff sought 17 million dollars, but was awarded only the nominal amount of one dollar. 506 U.S. at 106–108, 113 S.Ct. 566.[9] Attorney fees of $280,000.00 were awarded by the trial court, but the federal Circuit Court reversed. *Id.* at 107, 113 S.Ct. 566. Upon certiorari review, although the Supreme Court decided that a civil rights plaintiff was the "prevailing party" under the applicable federal attorney fee statute [42 U.S.C. § 1988] because he obtained a one dollar nominal damages award, the reversal

9. The initial plaintiff in *Farrar v. Hobby*, 506 U.S. 103, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992), having died prior to trial, the co-administrators of his estate were substituted as plaintiffs. 506 U.S. at 106, 113 S.Ct. 566. One of the co-administrators was also a plaintiff in the case in his personal capacity. 506 U.S. at 106 and n. 1, 113 S.Ct. 566.

of the fee award was affirmed by the Supreme Court.

¶ 13 In so doing, the Supreme Court recognized that the most critical factor in deciding the reasonableness of a fee award is the degree of success obtained. *Farrar, supra,* 506 U.S. at 114, 113 S.Ct. 566 [quoting *Hensley v. Eckerhart,* 461 U.S. 424, 436, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)]. Although not adopting the view that fees would never be appropriate when a plaintiff recovers only nominal damages, the Supreme Court made it clear that, "[w]hen a plaintiff recovers only nominal damages because of his failure to prove an essential element of his claim for monetary relief . . . the only reasonable fee is usually no fee at all." *Farrar, supra,* 506 U.S. at 115, 113 S.Ct. 566. Considering the degree of plaintiffs' success in the present case makes it obvious that no fee is warranted, as they were awarded **none** of the relief they sought, i.e., they sought **solely** money, but were awarded **zero** damages. A more poignant example of a lack of success would be hard to imagine.[10]

¶ 14 Although plaintiffs, in effect, argued in the trial court and try to convince us here that they succeeded in this case by achieving the goals of uncovering violation of the OCPA (in fact, obtaining a jury verdict that defendant in some way violated the OCPA) and defendant **may** have stopped the violative conduct because of the lawsuit, such arguments simply cannot sustain the attorney fee award before us. Plaintiffs' arguments in such regard are a means to assert the OCPA was legislatively intended as a private attorney general statutory scheme and that their suit was a "catalyst" for defendant's voluntary change of conduct. We deal

with these arguments more fully in **PART IV,** *infra,* because they do point out the stark reality we are faced with in this case that plaintiffs did not prevail and they were not the successful parties in this case. However, a few comments are in order here.

¶ 15 First off, the record in this appeal is not at all clear that defendant stopped any offending conduct by virtue of this lawsuit. Surely, nothing we glean from the record mandates defendant's future conduct one way or the other.[11] Second, merely showing some violation of the OCPA cannot be deemed success in any conventional sense when the only relief sought was money and nothing was recovered, i.e., merely showing violation without damages was, in our view, nothing more than a hollow, technical victory at best. Plaintiffs' arguments in such regard do not justify this attorney fee award or transform it into a reasonable award. Again, the only reasonable award in view of plaintiffs' lack of success is no fee.

**PART IV. AN EXCEPTION TO THE LAW OF THE CASE DOCTRINE IS APPLICABLE HERE AND WE OVERRULE** *TIBBETTS I* **AS INCONSISTENT WITH** *WALLS* **AND** *PATTERSON, SUPRA.*

¶ 16 Even when the law of the case doctrine is applicable, it will not be applied, i.e., there is an exception, if the prior decision is palpably erroneous and this Court is convinced that failure to reverse it will result in a gross or manifest injustice. *Cinco Enterprises, Inc. v. Benso,* 1999 OK 80, ¶ 11, 995 P.2d 1080, 1085; *Severson v. Roberts,* 1946 OK 94, 168 P.2d 615, 617. Further, exception to application of the law of the case

---

10. Even if we assume plaintiffs are correct [citing and relying on *Brashears v. Sight 'n Sound Appliance Centers, Inc.,* 1999 OK CIV APP 52, ¶ 16, 981 P.2d 1270, 1274] that monetary damages may be awarded in a private OCPA case for things such as loss of time, inconvenience, and travel and telephone expenses, no such damages were awarded by the now unassailable jury verdict that assessed plaintiffs' damages at **zero.** The bottom line in this case is that the plaintiffs were unsuccessful on the only legally viable claim they tried before the jury, a claim asserting they were entitled to recover monetary damages. No attorney fees are warranted in such a situation.

11. The record simply does not reveal that defendant changed any conduct in response to the instant suit nor have we been presented with a trial court finding in such regard. Although one of plaintiffs' attorneys testified at the hearing on attorney fees that defendant changed part of its advertising scheme at some point after this lawsuit was instituted, it would be pure speculation on our part, given the state of the record presented in this appeal, to determine what prompted such change. In fact, another of plaintiffs' attorneys seemed to testify at the attorney fee hearing that he did not know if the lawsuit brought about any change at defendant company.

doctrine based on gross or manifest injustice may be warranted where an award of attorney fees is clearly not authorized by any law. *C & L Enterprises, Inc. v. Citizen Band Potawatomi Tribe of Oklahoma*, 2002 OK 99, ¶¶ 20–21, 72 P.3d 1, 6. We believe *Tibbetts I* is palpably erroneous and a gross or manifest injustice would be done were we to use the law of the case doctrine to uphold this attorney fee award based on *Tibbetts I*.

¶ 17 The ultimate reality is that plaintiffs did not prevail and they were not the successful parties in this case because they failed to show an essential element of their claim, i.e., damages. *Walls, supra,* primarily based on the meaning of the term "aggrieved consumer" contained in § 761.1(A), the plain import of the words "damages" and "actual damages" also contained therein, and a historical analysis of amendment to § 761.1(A) after our decision in *Holbert v. Echeverria,* 1987 OK 99, 744 P.2d 960 (that rejected the notion the then existent version of the OCPA allowed a private individual cause of action under the Act), held that actual monetary damages, i.e., actual injury, was an essential element of the private right of action under the OCPA. *Walls,* 2000 OK 66, at ¶¶ 10–13, 11 P.3d at 629–630.[12] *Walls* made it abundantly clear that the language in § 761.1(A), using the term "aggrieved consumer" as the person having been given the right to bring a private right of action for damages under the OCPA, requires the consumer to show some-

thing more than a violation of the Act; instead for a viable private claim under the OCPA the consumer **must** show actual damages as a necessary element of a claim. 2000 OK 66, at ¶¶ 9–13, 11 P.3d at 629–630; *see also Patterson, supra,* 2000 OK 92, at ¶¶ 30–31, 19 P.3d at 846 (third element of a plaintiff's private action under the OCPA is that consumer suffered an injury in fact; private right of action granted only to "an aggrieved consumer", thus, to be aggrieved a consumer must sustain damages as a result of defendant's unlawful practice). The jury verdict here conclusively manifests a failure of plaintiffs on such front.

¶ 18 Where a plaintiff fails to show an essential element of a claim in a suit for damages it cannot reasonably be asserted that the plaintiff has been successful. We so ruled in *Sloan v. Owen,* 1977 OK 239, 579 P.2d 812, a negligence action, where we held that based on a jury verdict similar to that here—i.e., finding for the plaintiffs but fixing the amount of plaintiffs' recovery at zero damages—plaintiffs were not entitled to recover their costs under 12 O.S.1971, § 928 as they could not be deemed the successful parties on the claim as they necessarily failed to establish actionable negligence because they did not show an essential element of the claim, injury proximately resulting from defendant's breach of duty. *Sloan v. Owen, supra,* 579 P.2d at 813–814. In our present case, it would put form over substance to actually consider plaintiffs to be the prevail-

---

12. Title 15 O.S.2001, § 761.1(A) provides:
   A. **The commission of any act or practice declared to be a violation of the Consumer Protection Act shall render the violator liable to the aggrieved consumer for the payment of actual damages sustained by the customer and costs of litigation including reasonable attorney's fees, and the aggrieved consumer shall have a private right of action for damages, including but not limited to, costs and attorney's fees.** In any private action for damages for a violation of the Consumer Protection Act the court shall, subsequent to adjudication on the merits and upon motion of the prevailing party, determine whether a claim or defense asserted in the action by a nonprevailing party was asserted in bad faith, was not well grounded in fact, or was unwarranted by existing law or a good faith argument for the extension, modification, or reversal of existing law. Upon so finding, the court shall enter a judg-

ment ordering such nonprevailing party to reimburse the prevailing party an amount not to exceed Ten Thousand Dollars ($10,000.00) for reasonable costs, including attorney's fees, incurred with respect to such claim or defense. (Emphasis added.)

The non-bolded portion of § 761.1(A) is not involved in the present situation, although even that portion of the subsection seems to point in the direction that for a private individual to have a viable claim under the OCPA damages must be shown as the first sentence thereof begins "[i]n any private action **for damages** for a violation of the Consumer Protection Act...." (Emphasis added.) We also note that no relevant changes have been made to § 761.1(A) since this lawsuit was filed in 1994, although non-pertinent amendments have been made generally to § 761.1. *See* 1997 Okla.Sess.Laws, Ch. 133, § 134; 1999 Okla.Sess.Laws, 1st Ex.Sess., Ch. 5, § 61.

ing or successful parties as they recovered nothing from defendant.

¶ 19 In essence, the plaintiffs contend that the OCPA is a "private attorney general" statutory scheme that allows the recovery of attorney fees merely upon a showing of a violation of the Act (even though no damages are shown) and that the Legislature sanctioned such recovery of attorney fees in favor of private litigants who implement the public policy behind the OCPA and thereby encourage private litigation to benefit a legislatively recognized public interest.[13] In other words, plaintiffs contend the Legislature in § 761.1(A) authorized the award of attorney fees, without the showing of any damages or the award of any other tangible relief, based on the view a private litigant by bringing to light conduct violative of the OCPA provides a general benefit to the public at large. We do not read the statute in such a way and plaintiffs' theory in such regard is inconsistent with our pronouncements in both *Walls, supra* and *Patterson, supra.*

¶ 20 Plaintiffs' contention that the OCPA is a private attorney general statutory scheme and that they should be allowed to recover attorney fees here because they somehow vindicated a public right, is simply wrong. Again it is *Walls, supra,* that reveals the fallacy of plaintiffs' contention. For a private action to succeed the plaintiff **must** prove damages. Nowhere in § 761.1(A) is it indicated that attorneys are entitled to be compensated for merely showing some violation of the OCPA that caused no damages to their clients. This is particularly true where the clients owe the attorneys nothing because the attorney/client fee agreement is contingency-based [i.e., a percentage of any recovery], and the recovery is **zero**.[14]

¶ 21 Further, under the OCPA it is the Oklahoma Attorney General or a district attorney that may seek coercive relief, such as an injunction [§ 756.1], to vindicate public rights to see to it that companies do not violate the provisions of the OCPA.[15] Plain-

---

13. The United States Supreme Court rejected **judicial** authorization of a "private attorney general" encroachment on the American Rule concerning the propriety of the recovery of attorney fees against one's opponent in *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). We generally stated the contours of the American Rule in *State ex rel. Moshe Tal v. City of Oklahoma City*, 2002 OK 97, ¶ 16, 61 P.3d 234, 243, as follows:

> Oklahoma follows the American Rule as to the recovery of attorney fees. The Rule is generally that each litigant pays for their own legal representation and our courts are without authority to assess attorney fees in the absence of a specific statute or contract allowing for their recovery. *Kay v. Venezuelan Sun Oil Co.,* 1991 OK 16, 806 P.2d 648, 650. Exceptions to the Rule are narrowly defined [id.] and carved out with great caution [*Beard v. Richards,* 1991 OK 117, 820 P.2d 812, 816] because it is understood liberality of attorney fee awards against the non-prevailing party has a chilling effect on our open access to courts guarantee. *Id.*

This Court stands firmly committed to the American Rule. *Holbert v. Echeverria,* 1987 OK 99, 744 P.2d 960, 965.

14. In that the record in this matter conclusively shows the fee agreement between plaintiffs and their counsel was contingency-based and plaintiffs owe no attorney fees to their counsel be-

cause nothing was recovered, we need not definitively decide in this case if attorney fees, in some amount, would be allowable under § 761.1(A)'s language in a similar situation to that here (i.e., a violation is shown, but no actual damages found) and the attorney fee agreement was something other than contingency-based.

15. Title 15 O.S.2001, § 756.1, providing the same as when this lawsuit was brought by plaintiffs in 1994, provides:

> A. The Attorney General or a district attorney may bring an action:
> 1. To obtain a declaratory judgment that an act or practice violates the Consumer Protection Act;
> 2. To enjoin, or to obtain a restraining order against a person who has violated, is violating, or is likely to violate the Consumer Protection Act;
> 3. To recover actual damages and, in the case of unconscionable conduct, penalties as provided by this act, on behalf of an aggrieved consumer, in an individual action only, for violation of the Consumer Protection Act; or
> 4. To recover reasonable expenses and investigation fees.
> B. In lieu of instigating or continuing an action or proceeding, the Attorney General or a district attorney may accept a consent judgment with respect to any act or practice declared to be a violation of the Consumer Protection Act. Such a consent judgment shall provide for the discontinuance by the person

tiffs' attorneys, in effect, conceded at the attorney fee hearing that the OCPA does not permit injunctive relief in a private action.

¶ 22 Were we to allow this attorney fee award to stand based on plaintiffs' private attorney general theory, such a ruling would be completely at odds with *Walls, supra,* where we made it clear the OCPA requires actual damages be shown as an essential element of a private OCPA claim in order to transform a consumer into an "aggrieved consumer". Our ruling in *Walls,* if not expressly, necessarily implies that the OCPA is not a statutory scheme that envisions or embodies a private attorney general theory.

¶ 23 Plaintiffs also argue entitlement to attorney fees based on the argument that defendant might have changed its conduct because of this lawsuit. In effect, plaintiffs are arguing a "catalyst" theory in support of recovery of attorney fees, without obtaining any enforceable judgment against defendant that changes the legal relationship of the parties. The United States Supreme Court recently rejected the catalyst theory of attorney fee recovery in *Buckhannon Board and Care Home, Inc. v. West Virginia Department of Health and Human Resources,* 532 U.S. 598, 121 S.Ct. 1835, 149 L.Ed.2d 855

(2001). There the Supreme Court held that a party whose lawsuit induced voluntary change in defendant's conduct was not the prevailing party under the attorney fee provisions of the Fair Housing Amendments Act of 1988 (42 U.S.C. § 3601 et seq.) or the Americans with Disabilities Act of 1990 (42 U.S.C. § 12101 et seq.), because there was no enforceable judgment on the merits or court-ordered consent decree that somehow changed the relationship between the parties in such a way that defendant was actually required to do something by judicial sanction. Although, of course, we are not required to follow the Supreme Court's decision in this State law case under the OCPA, we hold that here without some judgment or judicial decree that has changed the relationship between the parties so that defendant is judicially required to do something, i.e., some enforceable judgment, plaintiffs cannot be said to be the successful or prevailing parties entitled to an award of attorney fees. There is no such enforceable judgment in this case requiring defendant to do anything.

¶ 24 Very simply, were we to accept plaintiffs' arguments in support of the affirmance of the fee award, we would be transforming the OCPA into something it is not

entering the same of any act or practice declared to be a violation of the Consumer Protection Act, and it may include a stipulation for the payment by such person of reasonable expenses and investigation fees incurred by the Attorney General or a district attorney. The consent judgment also may include a stipulation for restitution to be made by such person to consumers of money, property or other things received from such consumers in connection with a violation of this act and also may include a stipulation for specific performance. Any consent judgment entered into pursuant to this section shall not be deemed to admit the violation, unless it does so by its terms. Before any consent judgment entered into pursuant to this section shall be effective, it must be approved by the district court and an entry made thereof in the manner required for making an entry of judgment. Once such approval is received, any breach of the conditions of such consent judgment shall be treated as a violation of a court order, and shall be subject to all the penalties provided by law therefor.
C. In any action brought by the Attorney General or a district attorney, the court may:
1. Make such orders or judgments as may be necessary to prevent the use or employment

by a person of any practice declared to be a violation of the Consumer Protection Act;
2. Make such orders or judgments as may be necessary to compensate any person for damages sustained;
3. Make such orders or judgments as may be necessary to carry out a transaction in accordance with consumers' reasonable expectations;
4. Appoint a master or receiver or order sequestration of assets to prevent the use or enjoyment of proceeds derived through illegal means and assess the expenses of a master or receiver against the defendant;
5. Revoke any license or certificate authorizing that person to engage in business in this state;
6. Enjoin any person from engaging in business in this state; or
7. Grant other appropriate relief.
D. When an action is filed under the Consumer Protection Act by a district attorney or the Attorney General, no action seeking an injunction or declaratory judgment shall be filed in any other county or district in this state based upon the same transaction or occurrence, series of transactions or occurrences, or allegations which form the basis of the first action filed.

and would be allowing an attorney fee award not authorized by any law. This is something the OCPA nowhere requires and we decline to rewrite the Act to do so.[16]

## PART V. SUMMARY.

¶ 25 Plaintiffs sought solely money damages in their class action lawsuit brought against defendant under the OCPA. Although the jury returned a verdict which indicates some violation(s) of that Act were shown, the jury verdict found zero damages. The only reasonable attorney fee in this case, where plaintiffs' attorney fee agreement with their counsel was contingency-based, i.e., plaintiffs owe their attorneys no fees because there was no recovery, is no fee at all.

¶ 26 *Tibbetts I*, in effect, held that plaintiffs were entitled to recover attorney fees merely by showing defendant violated the OCPA in some way, even though they recovered **zero** damages and showed themselves entitled to **no** other relief. *Walls, supra* and *Patterson, supra* make clear that *Tibbetts I* was wrong

in such regard because to be an aggrieved consumer and to have a viable claim under the OCPA, actual damages must be shown. Plaintiffs showed no actual damages to the satisfaction of the jury. To the extent *Tibbetts I* is claimed by plaintiffs to be the law of the case such that the propriety of at least some attorney fee award may not now be challenged as they have been determined to be the prevailing or successful parties by that decision, we hold an exception to the law of the case doctrine applies as *Tibbetts I* is a palpably erroneous decision and a gross or manifest injustice would be done were we to allow the award for fees to stand when such is clearly not authorized by law and plaintiffs cannot be deemed to have prevailed because they recovered nothing. *Tibbetts I* is overruled.

■ ¶ 27 Accordingly, the opinion of the Court of Civil Appeals is **VACATED** and the trial court judgment awarding plaintiffs attorney fees of $375,000.00 is **REVERSED**.[17]

---

**16.** The dissenting in part opinion errs in postulating that plaintiffs have an accrued or vested right to recover attorney fees as an element of their recovery, even though plaintiffs owe **no** attorney fees. In other words, the dissenting in part opinion seems to fail to realize that the plaintiffs here, because of their contingency-based attorney fee agreement with their counsel, owe **no** attorney fees to their counsel for either bringing or litigating the case because **nothing** (i.e., **zero** damages) was recovered. We fail to understand how parties to litigation can have an accrued or vested right to obtain money as an element of recovery from a defendant, the money to be used to pay the parties' attorney fees, when the parties owe **no** attorney fees to their attorneys. In short, plaintiffs are being deprived of **nothing**. Further, the dissenting in part opinion's view, in effect, that we have retroactively abolished a claim of these plaintiffs to which a substantive right to counsel-fee recovery stood attached is also mistaken. Such an argument fails for the same reason the similar or identical accrued or vested right argument does, to wit: plaintiffs **owe no attorney fees to anybody** in regard to the litigation of this case on their behalf. The dissenting in part opinion seems to urge protection of something that does **not** exist. Neither logic, nor adherence to common law or constitutional principles, nor any other plea to purportedly established legal thought requires or warrants such protection. To protect something that has **no** existence would be enigmatic at best and, we believe, a valueless gesture, devoid of meaning and reason.

The dissenting in part opinion acknowledges that the exception to the law of the case doctrine applied by the Court in **PART IV** of this majority opinion is not of recently discovered-vintage. In its footnote 29 the dissenting in part opinion cites cases dating back to shortly after statehood that recognize the existence of the exception. Although we agree with the dissenting in part opinion's general tenor that any exception to the law of the case doctrine should be tightly circumscribed, recognition of an exception essentially based on the palpably erroneous and gross or manifest injustice standard (as set out in ¶ 16 of this majority opinion) is of long-standing jurisprudential cognizance.

Contrary to the dissenting in part opinion's belief, the majority opinion does not measure legal rights by personal predilection based on an empty or shapeless yardstick; instead, the majority opinion has as its foundation sound law that is applied in light of the record presented to this Court. The dissenting in part opinion would have us gauge legal rights based on theoretical concepts divorced from the real case that is before this Court. This we will not do.

**17.** Prior to our granting certiorari on July 1, 2002, plaintiffs filed a motion for appeal-related attorney fees for work associated with this appeal, citing § 761.1(A) of the OCPA and 20 O.S. 2001, § 15.1. Obviously, in light of our disposition it is plain § 761.1(A) provides no basis to award plaintiffs such fees. Section 15.1 allows this Court to award attorney fees to the opposing side when an appeal is patently frivolous. *TRW/Reda Pump v. Brewington*, 1992 OK 31, 829 P.2d

¶ 28 WATT, C.J., HODGES, SUMMERS, BOUDREAU and WINCHESTER, JJ., concur.

¶ 29 HARGRAVE and KAUGER, JJ., concur in result.

¶ 30 OPALA, V.C.J., dissents in part.

OPALA, V.C.J., dissenting in part.

¶ 1 The court reverses today the trial court's counsel-fee award to the plaintiffs and **expressly overrules** the statutory-law norm announced for this litigation in the earlier appeal of this cause (*Tibbetts I* ).[1] The overruled norm, which initially received a green light by this court's previous **denial of certiorari,** upheld **the unharmed plaintiff's right to press a private claim** for the Oklahoma Consumer Protection Act's [Act] [2] violation and to receive a counsel-fee award as an additional element of their recovery. By today's opinion the counsel fee **is now declared both contrary** to this court's **after-crafted jurisprudence**[3] in *Walls v. American Tobacco Co.*[4] and *Patterson v. Beall*[5] and **unreasonable** (in light of a zero-damage jury finding for the plaintiff's actual damages, which stands affirmed by *Tibbetts I* ). Upon substituting its **after-promulgated statutory norm** (of *Walls* and *Patterson* ) for that which was earlier declared in *Tibbetts I*, the court *opines* that the plaintiffs *did not have an actionable private claim and hence could not be regarded as successful litigants* in the case. They had failed to show the now-required element of harm to their interests. It is the *Walls* and *Patterson* norm that the court applies to this claim today, **even though the contrary holding announced in the earlier published, controlling and undisturbed COCA decision (a) bears unquestionable attributes of finality, (b) stands unrepudiated in the reports and (c) has never been *directly* challenged.**[6]

¶ 2 My dissent *addresses itself solely to the aftermath* of today's departure from the course charted by *Tibbetts I*. It deals not with the new trail we blaze but rather with the havoc we wreak by abandoning the time-honored teachings of Anglo–American orthodoxy in appellate judicature.[7] *I would not apply to this case the* court's *repronouncement* of its rule change [8] in *Walls* and *Patterson*. That application is patently offensive not only to the long-established teachings of the Anglo–American legal system discussed below, but also to the state constitution's expressed command (a) for continued and evenhanded application of the substantive norms of law in force when a "proceeding is begun" as well as (b) for the mandated fundamental-law protection of "accrued rights".

# I

## CRITICAL LITIGATION HISTORY

### A.

### *COCA's Tibbetts I*

¶ 3 In a class action brought under the

---

15. Again, our disposition makes clear defendant's appeal in this case is not patently frivolous. Plaintiffs' motion for appeal-related attorney fees filed May 3, 2002 is **denied.**

1. *Tibbetts v. Sight 'n Sound Appliance Centers, Inc.*, 2000 OK CIV APP 47, 6 P.3d 1064 (*promulgated* **30 November 1999,** *certiorari denied* **30 March 2000,** *mandate issued* **15 May 2000**) [*Tibbetts I*].

2. 15 O.S.1991 § 751 *et seq.*

3. As a term of art "jurisprudence" has two different core meanings—**caselaw and legal philosophy.** BLACK'S LAW DICTIONARY 858–59 (7th ed.1999). When this dissent is referring to after-crafted jurisprudence, it uses the legal term in its former sense.

4. 2000 OK 66, 11 P.3d 626 (a federal certified question)(*promulgated* **19 September 2000**).

5. 2000 OK 92, 19 P.3d 839 (*promulgated* **14 November 2000,** *mandate issued* 2 February 2001).

6. Defendant's challenge here is **collateral** and based solely on the standard of manifest injustice.

7. The term "judicature" means judicial decision-making. BLACK'S LAW DICTIONARY 850 (7th ed.1999).

8. By "rule change" I mean the change in the statutory text's construction *for application to this case* by today's pronouncement. The change is effected by the court's after-crafted ascription of a different meaning to the critical text of the Act and by retroactively amending the substantive law finally declared in *Tibbetts I*.

Act,[9] the jury returned a verdict for the plaintiffs, but awarded them no actual damages. At a postjudgment hearing, the trial court denied both parties' quest for an attorney's fee. Two separate appeals were then brought from counsel-fee denial. In a **published opinion**[10] the Court of Civil Appeals [COCA] **reversed the nisi prius ruling and directed the trial court to conduct a hearing for determination of a reasonable attorney's fee for the plaintiffs. This court denied the defendant's quest for certiorari review**[11] but chose not to withdraw from publication COCA's opinion in the case (*Tibbetts I*).

### COCA's Tibbetts II

¶ 4 Upon a postremand evidentiary hearing on the counsel-fee issue (that occurred after COCA's *Tibbetts I* promulgation and this court's issuance of its mandate following certiorari's denial), the trial court entered an award of $375,000 for the plaintiffs' legal fee. COCA affirmed (in *Tibbetts II*)[12] and we granted certiorari for review of that opinion, which now stands here for decision.

### B.

### After–Crafted Statutory Jurisprudence

¶ 5 *Walls*[13] and *Patterson*[14] constitute after-promulgated changes in the controlling statutory-law norm pronounced by and for *Tibbetts I*.[15] Both of these post-*Tibbetts I* cases declare harm to be an essential element of a consumer's private claim for the Act's violation. ***Tibbetts I* explicitly and unequivocally pronounces the opposite**

view. Although *Walls* and *Patterson departed* from **a substantive norm of statutory jurisprudence announced in** *Tibbetts I*, they neither expressly overruled nor even gave mention to the persuasive authority of the then-extant *Tibbetts I* published opinion. The latter survives in fact and in the law books as an **unrejected norm of judicially declared statutory law for this litigation at the time this cause returned to the trial court for the directed postremand proceedings.** *Today's pronouncement abolishes* retroactively *these unharmed plaintiffs' private claim under the Act together with their* **previously pronounced** *entitlement to an attorney's fee.* **By retroactively repudiating** *Tibbetts I*, **the court can escape neither the consequences of the settled-law-of-the-case doctrine (and of the issue-preclusion bar) nor of Oklahoma's constitutional restraints on after-crafted lawmaking, which restraints extend to substantive-law changes by jurisprudence no less than they do to those effected by legislative enactment.**[16] This assessment expresses the crux of my dissent.

### II

### FOR ITS REJECTION OF SETTLED LAW OF THE CASE THE COURT INVOKES TODAY A STANDARDLESS TESTING FORMULA

### A.

### The Settled–Law–of–the–Case Doctrine

¶ 6 The court *refuses* to be bound here by the settled law of the case. It *rejects* the

---

9. Oklahoma Consumer Protection Act, *supra* note 2.

10. *Tibbetts I, supra* note 1.

11. The 30 March 2000 order **denying certiorari** bears the following vote: ***Concur:*** Hargrave, V.C.J., Hodges, Opala, Kauger, Watt, Boudreau, JJ. ***Dissent:*** Summers, C.J., Lavender, Winchester, JJ. **Mandate issued 15 May 2000.**

12. COCA'S *Tibbetts II* pronouncement was by an unpublished opinion of 26 April 2002, which stands vacated by today's disposition.
According to COCA's *Tibbetts II* opinion (1) settled law of the case bars relitigation of plaintiffs' entitlement to an attorney's fee, (2) the record does not support defendant's argument that the

quantum of awarded counsel fee demonstrates an abuse of discretion, and (3) the reviewing COCA panel was powerless to depart from the earlier settled-law command by another COCA panel's opinion.

13. *Supra* note 4.

14. *Supra* note 5.

15. ***Walls* and *Patterson* clearly came to be promulgated after certiorari was denied and mandate issued in *Tibbetts I, supra* note 1.**

16. For constitutional restraints upon legislative enactments with retroactive effect see Parts IV–VII *infra*.

doctrine as *unjust* for application to this litigation. "Justice" is interposed as the *sine qua non* of an adjudication's qualification for settled-law effect.

¶ 7 The settled-law-of-the-case doctrine operates to bar relitigation in the same case of issues that were finally decided through an appellate process.[17] The earlier decision on review becomes binding in all subsequent stages of the case. The doctrine not only ensures absolute consistency of later with former issue resolutions, it also guards against abuse of judicial process by preventing relitigation of issues **settled in the course of an earlier appellate stage of the case.**[18]

¶ 8 **I would not loosen one iota the firm grip of control the reviewing process of correction now wields over postremand proceedings whose course stands charted by an appellate disposition; I would firmly and loudly condemn every unauthorized** departure from settled law, either in postremand proceedings at nisi prius or in any other review stages that may follow. I would sanction departures from settled law solely for those issues which are determined not to have been fully and fairly litigated.[19]

## B.

### *"Injustice"—The Open-ended Judicial Escape Hatch From Settled Law*

¶ 9 Today's pronouncement offers an open-ended judicial escape hatch from the established restraints that the settled-law doctrine imposes. The formula by which the court justifies its departure from settled law—a manifest "injustice" from its application—is patently overbroad and amorphous.[20] Justice is a vacuous and shapeless legal norm [21] that has been dubbed an antonym of due process.[22] Its yardstick is much like that of

17. *Nichols v. Mid–Continent Pipe Line Co.*, 1996 OK 118, ¶ 24, 933 P.2d 272, 281; *Morrow Development Corp. v. American Bank and Trust Co.*, 1994 OK 26, ¶ 2, 875 P.2d 411, 413; *Panama Processes, S.A. v. Cities Service Co.*, 1990 OK 66, ¶ 11 n. 27, 796 P.2d 276, 283 n. 27; *Mobbs v. City of Lehigh*, 1982 OK 149, ¶ 6 n. 5, 655 P.2d 547, 549 n. 5.

18. The settled-law-of-the-case doctrine operates *to bar relitigation of issues that are finally settled by an appellate opinion and of those that the aggrieved party has failed timely to raise in the course of appellate contest. Nealis v. Baird*, 1999 OK 98, ¶ 61, 996 P.2d 438, 462; *Barnett v. Barnett*, 1996 OK 60, ¶ 13, 917 P.2d 473, 477; *Jackson v. Jones*, 1995 OK 131, ¶ 12 n. 37, 907 P.2d 1067, 1074 n. 37; *Morrow Dev. Corp., supra* note 17, at ¶ 2 n. 2, at 413 n. 2; *Handy v. City of Lawton*, 1992 OK 111, ¶ 13, 835 P.2d 870, 873.

19. *See* Parts II(C) and III, *infra*.

20. *State ex rel. Oklahoma Bar Ass'n v. Minter*, 2001 OK 69, ¶ 24 n. 55, 37 P.3d 763, 774 n. 55.

21. Many commentators have recognized our inability to agree upon a single concept of justice. In WHAT IS JUSTICE?: JUSTICE, LAW, AND POLITICS IN THE MIRROR OF SCIENCE 1, 1, 4 (1957), Hans Kelsen, the twentieth-century legal philosopher, writes: "No other question has been discussed so passionately; no other question has caused so much precious blood and so many bitter tears to be shed; no other question has been the object of so much intensive thinking by the most illustrious thinkers from Plato to Kant; and yet, this question is today as unanswered as it ever was. .... [It relates to] which human interests are worthy of being satisfied and, especially, what is their proper order of rank? ... The problem of values is in the first place the problem of conflicts of values, and this problem cannot be solved by means of rational cognition. The answer to these questions is a judgment of value, determined by emotional factors, and, therefore, subjective in character—valid only for the judging subject, and therefore relative only." *See also* Alasdair MacIntyre, WHOSE JUSTICE? WHICH RATIONALITY? 1 (1988) ("... underlying this wide diversity of judgments upon particular types of issue are a set of conflicting conceptions of justice, conceptions which are strikingly at odds with one another in a number of ways"). A similar point is made by Knut Wicksell, A NEW PRINCIPLE OF JUST TAXATION, IN CLASSICS IN THE THEORY OF PUBLIC FINANCE 72, 74 (Richard A. Musgrave & Alan T. Peacock eds., 1958) ("Each attempted solution of our problem will necessarily be coloured more or less by the general social and political philosophy of the writer, by his station in life, and by his personal sympathies and antipathies.... Justice from above to below always smacks of condescension or contempt. Justice from below to above has only too often been synonymous with revenge.").

22. At least one justice of the U.S. Supreme Court counseled more than once that the term "justice" is incompatible with the standard of due process. *Sniadach v. Family Finance Corp. of Bay View*, 395 U.S. 337, 350–351, 89 S.Ct. 1820, 1827, 23 L.Ed.2d 349 (1969) (Black, J., dissenting). Justice Black opines in *Sniadach* that the "notions of justice of English-speaking peoples" or "the

an empty vat into which one may pour contents at will. It has been defined as a standardless product of the natural-law reasoning process.[23] Subjecting settled law to repeated scrutiny by afterthought based on a vacuous gauge will most surely undermine, if not indeed destroy, interinstitutional deference within the judicial service and the internal discipline among the courts. In short, I join many generations of judges and scholars in **rejecting "justice" as an acceptable standard for departure from settled law.** As a legal gauge, justice is as deceiving as the shifting sands upon which it is founded.

## C.

### Justice is Gauged by One's Individual Predilection

¶ 10 Is injustice (as a pretense for rejecting settled law) to be measured by an **enormity of the mistake in shaping a flawed norm** or by the **severity of philosophical differences between an earlier-adopted and the later-rejected norm?** No matter what measuring tape one will use, justice is but an empty and shapeless legal yardstick whose contours are circumscribed by nothing more than one's individual predilection. **I must hence condemn rather than embrace justice as a legal norm.** It is not concrete enough. If invoked, it becomes putty in the hands of the shaping applicator. Any authorized departure from settled law should instead be rested on the U.S. Supreme Court's well-established gauge (for applying issue preclusion) by which **we must first answer** whether the issue whose resolution is to be accepted as binding was **fully and fairly explored** in advance of its settlement.[24] If so, settled law must govern; if not, it may be rejected. To hold otherwise injects whim into the legal system. **Moreover, I would be loath to invite this State's courthouse and statehouse judges to regard themselves freed from obedience to any settled rulings which they may be tempted to condemn as offensive to their sense of justice.**

---

**23.** shock-of-the-conscience test" "represent nothing more or less than an implicit adoption of a Natural Law concept which under our system leaves to judges alone the power to decide what the Natural Law means. These so-called standards do not bind judges within any boundaries that can be precisely marked or defined by words for holding laws unconstitutional. On the contrary, these tests leave them [judges] wholly free to decide what they are convinced is right and fair." *Id.* In *Matter of Winship,* 397 U.S. 358, 377–78, 90 S.Ct. 1068, 1079–80, 25 L.Ed.2d 368 (1970), referring to the "shock the conscience" test, Justice Black states that he would "prefer to put [his] faith in the words of the written Constitution itself, rather than to rely on the shifting, day-to-day fairness standards of individual judges." (Black, J., dissenting).

Like the term "justice" itself, conduct prejudicial to the "administration of justice," when used as a basis of prosecution for the commission of a disciplinary offense, has also met with wide criticism by scholars and judges alike for its *sheer overbreadth.* Oklahoma caselaw *wisely requires* that each act or omission charged under the rubric of "conduct prejudicial to the administration of justice" be sufficient to stand alone as a breach of professional responsibility. *Minter, supra* note 20, at ¶ 24 at 774; *State ex rel. Oklahoma Bar Association v. Bourne,* 1994 OK 78, ¶ 6, 880 P.2d 360, 361; Martha E. Johnson, Comment, *ABA Code of Professional Responsibility: Void for Vagueness?,* 57 N.C.L.Rev. 671, 684–85 (1979); Donald T. Weckstein, *Maintaining The Integrity And Competence Of The Legal Profession,* 48 Tex.L.Rev. 267, 275–76 (1970).

**23.** In his treatise, GENERAL THEORY OF LAW AND STATE (Harvard University Press, 1945), Hans Kelsen posits that justice—the ideal of a just social order—is a subjective, socially constructed judgment of value, which varies from place to place and time to time. It is not determined by means of rational cognition. "Since humanity is divided into many nations, classes, religions, professions and so on, often at variance with one another, there are a great many very different ideas of justice; too many for one to be able to speak simply of 'justice.'" *Id.* at 8. The doctrine of natural law claims to establish the content of justice on a rational basis, but Kelsen argues that its notion is illusory. "[N]one of the numerous natural law theories has so far succeeded in defining the content of this just order in a way even approaching the exactness and objectivity with which natural science can determine the content of the laws of nature, or legal science the content of a positive legal order." *Id.* at 9. See also *Sniadach, supra* note 22, at 395 U.S. at 350–51, 89 S.Ct. 1820; (Black, J., dissenting); *Calder v. Bull,* 3 U.S. (3 Dall.) 386, 398–399, 1 L.Ed. 648 (1798) (Iradell, J., concurring) ("The ideas of natural justice are regulated by no fixed standard: the ablest and the purest men have differed upon the subject"). Rather than seeking "justice," Kelsen maintains that the best a society can do is establish a positive legal order that minimizes the frictions among different interests and, in doing so, establishes a framework for social peace.

**24.** For the U.S. Supreme Court's "fully-and-fairly-litigated" standard, see *infra* note 34.

¶ 11 The outer reach of a private right of action that is invocable under any legislative enactment does not present a unique controversy.[25] Whenever a disagreement arises between two appellate courts over the proper legislative intent that must guide the construction to be placed upon the statute's text, it does not follow as a matter of law that the ultimately rejected view may also be rejected out-of-hand as unjust. The focus of inquiry to be conducted in order to resolve the question we answer today is whether the **law settled** by the earlier disposition is vulnerable to departure because the issue now to be accepted as settled **had not been fully and fairly litigated.** The integrity of judicial process is gravely offended when a higher court deems itself free to relegate to the rubric of "injustice" an inferior court's final pronouncement for nothing more than a simple disagreement on a matter of statutory intent.

¶ 12 Because, on the record before us, there is absolutely no showing that the actionable character of the plaintiffs' private claim under the Act had not been fully and fairly litigated, I must consider myself bound here by COCA's pronouncement in *Tibbetts I.*

### D.

### *The "Injustice" Done Here Consists of This Court's Retroactive Departure From Settled Law*

¶ 13 The **"injustice"** done here lies not in COCA's now-rejected jurisprudence of *Tibbetts I* but in this court's shift of its judica-

ture: **in its voting pattern's change from yesterday's denial of certiorari—with a green signal given for the commanded postremand proceedings—to today's attack upon the mandate of *Tibbetts I* left intact by this court's election not to grant certiorari.** The guilt from our own failure to act may not be shifted from ourselves to COCA. Nor may we, with a clear conscience, leave utterly helpless those litigants who were harmed by relying on that inaction. They too, like all others, deserve fairness. **To them fairness lies in consistent adherence to the effective norms of yore.[26] Because it is this court's own failure to stay the course (charted by *Tibbetts I*) which has produced today's dilemma, it behooves it to apply here a solution fully consistent with the orthodoxy of the Anglo–American judicature and with the State's constitutional restrictions on retrospective lawmaking.**

### E.

### *The Court's Pronouncement Impermissibly Recasts Oklahoma's Appellate Regime Into A Cassation-like Model of Post–Revolutionary France*

¶ 14 The **court's endorsement of open-ended freedom to repudiate settled law at will is utterly incompatible** with the basic teachings of appellate judicature in the Anglo–American legal tradition. Today's opinion introduces to the State a post-appeal decisionmaking regime long associated with Franco–Roman cassation[27]—an institution

---

**25.** The outer reach of a private right of action under a regulatory statute is not an infrequent subject of controversy. The U.S. Supreme Court has recently granted certiorari in a case from the Fourth Circuit which concludes that a plaintiff, if unharmed, has no private right of action. The Fifth, Ninth, Tenth, Eleventh and D.C. Circuits all held that an unharmed plaintiff may, under the Privacy Act, recover $1,000 without any proof of actual damages. *Doe v. Chao,* — U.S. ——, 123 S.Ct. 2640, 156 L.Ed.2d 654 (Mem) (2003). *No matter what the Court will ultimately hold, can it be said that the circuits which espoused a contrary view reached an "unjust" conclusion?*

**26.** As Kenneth Culp Davis notes in his ADMINISTRATIVE LAW TEXT at 135 (3d ed. 1972), "retroactive

clarification of *uncertain law* ordinarily involves no unfairness. *It is retroactive change of settled law,* not retroactive settling of unsettled law, *which may produce unjust results." Id.* (emphasis added).

**27.** The Franco–Roman cassation model is vastly different from the Anglo–American regime. In its original post-revolutionary form, the highest French court (*Cour de Cassation*) lacked the power to render binding decisions. Its authority was narrowly limited to quashing the judgment and remanding the case to a lower court for reconsideration *de novo.* The latter court was not bound by the cassation decision's view of the law. Rudolf B. Schlesinger, COMPARATIVE LAW 332–333 (1970). The original cassation model has been somewhat relaxed. Rupert Cross and

never followed in any jurisdiction within the Anglo–American legal heritage. By overturning the law settled in *Tibbetts I*, the court has refashioned the State's institutional design for appellate judicature into a veritable cassation process. **Cassation absolutely confines** the appellate court's authority to quashing the judgment. It does not authorize the judgment-quashing tribunal to direct either the *course or the complexion of post-remand proceedings. The Oklahoma Court of Civil Appeals is not established on a Franco–Roman model of cassation. It functions as an intermediate tribunal of review in the State's Anglo–American tradition.*

¶ 15 Today's reshaping of Oklahoma's appellate judicature into a Franco–Roman cassation model will generate interminable post-appeal litigation. No courthouse judge will ever again feel bound by an undisturbed COCA pronouncement. The new design will leave valuable rights in limbo over a long stretch of post-appeal forensic battles at nisi prius and elsewhere.[28] In sum, the court's retroactive change of an effective and settled statutory norm deals lasting and grave harm

J.W. Harris, Precedent in English Law 10–14. Black's Law Dictionary (7th ed.1999) tersely defines "cassation" as "a quashing" (invalidation of judgment). *Id.* at 209.

28. The Franco–Roman cassation model is antithetical to the common-law maxim *interesse rei publicae ut sit finis litium.* The maxim means that "it is in the interest of the state that there be a limit to litigation." Black's Law Dictionary 1647 (7th ed.1999). It is the paramount concern of the state that there be an end to litigation. Today's opinion offends this nearly 900–year-old policy of the common law. Instead of assisting in bringing about an end to litigation, the court extends the life of a forensic battle by sanctioning a retroactive change in an effective statutory norm that attained finality by the court's own failure to act in due time and course of this case's progress.

29. As a basis for departure from settled law "justice" was introduced to Oklahoma reports by early post-statehood jurisprudence. *Oklahoma City Elec., Gas & Power Co. v. Baumhoff,* 1908 OK 134, ¶9, 96 P. 758, 760–61, 21 Okl. 503; *Metropolitan Ry. Co. v. Fonville,* 1912 OK 389, ¶ 1, 125 P. 1125, 1126, 36 Okl. 76; *Wade v. Hope & Killingsworth,* 1923 OK 108, ¶ 14, 213 P. 549, 551, 89 Okl. 64. Because of its detrimental and distortive impact on appellate judicature as well as on the state constitutional constraints upon

to the symmetry of Oklahoma's system of appellate judicature.

¶ 16 *COCA's Tibbetts I* **settled for this case the legal principle that the unharmed plaintiffs had a private claim under the Act with an ancillary entitlement to an attorney's fee. The court renounces its obedience to this norm of settled law upon a purely vacuous and shapeless legal standard. I am compelled to stand bound by the settled law of this case.**[29]

**III**

**THE CLAIM ABOLISHED TODAY IS PROTECTED FROM BELATED JUDICIAL DESTRUCTION BY THE DOCTRINE OF ISSUE PRECLUSION**[30]

¶ 17 When certiorari was denied (and finality of COCA's decision came to be reached), **the unharmed plaintiffs' entitlement to prosecute a private claim for a mere violation of the Act** (to which counsel-fee recovery stood attached in favor of one declared to have emerged as prevailing party) **became protected by the doctrine of issue preclusion.**[31]

retrospective lawmaking, it should now be relegated to antiquarian lore.

30. The term "issue preclusion," formerly known as collateral estoppel, has been adopted by the Restatement of Judgments (Second) § 27, Comment b (1982). The use of the more descriptive term—issue preclusion—was originally advanced in the works of Professor Allan D. Vestal, Res Judicata/Preclusion, Personal Injury Annual (1969); *Res Judicata/Preclusion: Expansion,* 47 S. Cal. L.Rev. 357 (1974); *State Court Judgment as Preclusive in Section 1983 Litigation in a Federal Court,* 27 Okla. L.Rev. 185 (1974). *See Underside v. Lathrop,* 1982 OK 57, ¶ 6 n. 8, 645 P.2d 514, 517 n. 8; *Veiser v. Armstrong,* 1984 OK 61, ¶ 8 n. 7, 688 P.2d 796, 799 n. 7.

31. The purpose of issue preclusion is to " 'relieve the parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and by preventing inconsistent decisions, encourage reliance on adjudication.' " *Miller v. Miller,* 1998 OK 24, ¶ 25, 956 P.2d 887, 897 (quoting *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 418, 66 L.Ed.2d 308 (1980)); *Feightner v. Bank of Oklahoma, N.A.,* 2003 OK 20, ¶ 15, 65 P.3d 624, 629–30; *State ex rel. Tal v. City of Oklahoma City,* 2002 OK 97, ¶ 20, 61 P.3d 234, 244; *Veiser supra* note 30, at ¶ 8 n. 9, at 800. The issue (collateral estoppel) and claim (res judicata) preclusion doc-

¶ 18 Issue preclusion *prevents relitigation* of facts and other issues actually litigated and necessarily determined in an earlier proceeding between the same parties or their privies.[32] The preclusion doctrine (both with respect to its claim and issue applications) *fosters* the important goal of affording *finality*[33] to all issues, of fact or law, **which were**

fully and fairly litigated.[34] The preclusion doctrine is applicable whether the contested issues in the case in which it is invoked were rightly or wrongly decided.[35]

¶ 19 Actionability of the plaintiffs' private claim was finally resolved in their favor in *Tibbetts I*[36] by this court's denial of certiorari and subsequent issuance of its mandate.[37]

---

trines are often used interchangeably because they are closely related and both promote the same general public policy concerns. *Miller, supra,* at ¶ 22, at 896.

32. "Collateral estoppel, like the related doctrine of res judicata, has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." *Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 326, 99 S.Ct. 645, 649, 58 L.Ed.2d 552 (1979). In furtherance of those policies, the U.S. Supreme Court has, in recent years, broadened the scope of the doctrine of collateral estoppel beyond its common-law limits. It has done so by abandoning the requirement of mutuality of parties (*Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971)) and by conditionally approving the "offensive" use of collateral estoppel by a nonparty to a prior lawsuit. *Parklane Hosiery, supra.*

33. Finality of adjudication process is a core concept in the Anglo–American legal system. "A fundamental precept of common-law adjudication, embodied in the related doctrines of collateral estoppel and res judicata, is that a 'right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction ... cannot be disputed in a subsequent suit between the same parties or their privies....'" *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979)(quoting *Southern Pacific R.R. v. United States,* 168 U.S. 1, 48–49, 18 S.Ct. 18, 27, 42 L.Ed. 355 (1897)); *Feightner, supra* note 31, at ¶ 15, at 630; *Daniel v. Daniel,* 2001 OK 117 ¶ 14, 42 P.3d 863, 869; *Fent v. ONG,* 1994 OK 108,¶ 11, 898 P.2d 126, 132. Issue preclusion is invocable to bar relitigation of both issues of law and issues of fact. *United States v. Stauffer Chemical Company,* 464 U.S. 165, 170–71, 104 S.Ct. 575, 578, 78 L.Ed.2d 388 (1984).

34. *Parklane, supra* note 32, 439 U.S. at 332, 99 S.Ct. at 652; *Miller, supra* note 31, at ¶ 28, at 898; *Fent, supra* note 33, at ¶ 15, at 133; *Veiser, supra* note 30, at ¶ 16 n. 21, at 802. In *Standefer v. United States,* 447 U.S. 10, 24, 100 S.Ct. 1999, 2008, 64 L.Ed.2d 689 (1980), the Court noted that in cases like *Blonder–Tongue, supra* note 32, and *Parklane, supra,* which dealt with disputes over *private rights between private litigants,* "no

significant harm flows from enforcing a rule that affords a litigant only one *full and fair opportunity to litigate an issue,* and [that] there is no sound reason for burdening the courts with repetitive litigation." (emphasis added).

35. *National Diversified Business Services, Inc. v. Corporate Financial Opportunities, Inc.,* 1997 OK 36, ¶ 11, 946 P.2d 662, 666–67 (*issue preclusion operates to bar from relitigation both correct and erroneous resolutions of jurisdictional and nonjurisdictional challenges*); *Fent, supra* note 33, at ¶ 15, at 133; *Veiser, supra,* note 30, at ¶ 18, at 802; 18 Wright, Miller & Cooper, FEDERAL PRACTICE AND PROCEDURE § 4403 at 17 (2d ed.2002).

36. *See supra* note 1.

37. The terms of Rule 1.16 (Mandate), Oklahoma Supreme Court Rules, as amended 16 June 2003 (2003 OK 62), 12 O.S. Supp.2003, Ch. 15, App. 1, provide in pertinent part:
   In every appeal or petition to review any order of a district court or other tribunal, a mandate will be issued to the lower court or tribunal on order of the Chief Justice upon conclusion of the matter on appeal. The mandate may be issued seven (7) days after the filing of an order denying certiorari or rehearing in the Supreme Court, or immediately upon expiration of time to file a petition for writ of certiorari or petition for rehearing, and disposition of any timely filed post-decisional motion. No mandate is issued upon conclusion of original actions, questions certified by federal courts, bar disciplinary matters, or original proceedings on initiative or referendum petitions.
The terms of Rule 1.181 (Denial of Petition for Writ), Oklahoma Supreme Court Rules, 12 O.S. Supp.1997, Ch. 15, App. 1, provide:
   When a petition for writ of certiorari is denied an order shall be entered to that effect and the *mandate shall issue.* If writ of certiorari is denied, no petition for rehearing may be filed in the Supreme Court. See Rule 1.13.
(emphasis added).
*Fent, supra* note 33, at ¶ 11, at 132; *Cox v. Kansas City Life Ins. Co.,* 1997 OK 122, ¶ 4, 957 P.2d 1181, 1184 (the trial court's judgment, as modified by COCA, became final when mandate issued); *Special Indemnity Fund v. Cole,* 1992 OK 104, ¶ 11, 834 P.2d 959, 962. *When a mandate is issued, the trial court has the duty to comply with its terms. Hurst v. Brown,* 1954 OK 25, ¶ 7, 266 P.2d 438, 440; *Grayson v. Stith,* 1943 OK 150, ¶ 20, 138 P.2d 530, 533, 192 Okl. 340.

The latter judicial act put an end to all direct remedies available for correction of that pronouncement, even if it were flawed by ascribing the wrong meaning to the text of the Act. I would neither tamper with nor repudiate the command of issue-preclusion doctrine by retroactively applying after-crafted changes to a once finally shaped norm of controlling statutory law.[38]

¶ 20 Under the terms of today's opinion, no mandate of this court could ever again attain the status of unassailable finality for the pronounced rulings in a case.

## IV

STATE CONSTITUTIONAL RESTRICTIONS UPON RETROSPECTIVE LEGISLATION APPLY WITH EQUAL FORCE TO AFTER–PROMULGATED SUBSTANTIVE–LAW JURISPRUDENCE THAT ADVERSELY AFFECTS (1) PROCEEDINGS BEGUN AND (2) ACCRUED RIGHTS

### A.

*Judicial Promulgation of Statutory Jurisprudence-i.e., Caselaw That Imparts Meaning to the Legislative Text According to the Found Intent of the Lawmaking Assembly–Is a Long-recognized Legitimate Form of "Interstitial Lawmaking" by Adjudication*

¶ 21 *Lawmaking is not the monopoly of the Legislature.* A judge engages in lawmaking through adjudication when **interstitially** filling a gap in the law by formulating a common-law rule,[39] construing a statute or agency rule, or by framing a constitutional norm.[40] Both the process of developing the

---

**38.** While issue preclusion is an affirmative defense that must be pleaded and proved, an appellate court may raise it *sua sponte*. *Nealis, supra* note 18, at ¶ 51 n. 88, at 458. *See also Jackson v. N. Bank Towing Corp.*, 213 F.3d 885, 889 (5th Cir.2000) (the court is permitted to raise the issue of res judicata *sua sponte* to affirm the district court); *Doe v. Pfrommer*, 148 F.3d 73, 80 (2d Cir.1998); *Indep. Sch. Dist. No. 283 v. S.D.*, 88 F.3d 556, 562 n. 5 (8th Cir.1996) ("Preclusion may be raised by the court because 'benefits of precluding relitigation of issues finally decided run not only to the litigants, but also to the judicial system.' "); *Studio Art Theatre of Evansville, Inc. v. City of Evansville*, 76 F.3d 128, 130 (7th Cir.1996); 18 Wright, Miller & Cooper, FEDERAL PRACTICE AND PROCEDURE § 4405 (2d ed. 2002) ("It has become increasingly common to raise the question of preclusion on the court's own motion."). "Allowing an appellate court to raise res judicata [sua sponte] is consistent with policies of avoiding unnecessary judicial waste ... and fostering reliance on judicial decisions by precluding relitigation." *Merrilees v. Treasurer*, 618 A.2d 1314, 1315, 159 Vt. 623 (1992).

**39.** Judges have a legislative license to continue crafting the norms of Oklahoma's common law. It stands conferred upon the judicial service by the provisions of 12 O.S.2001 § 2. The terms of § 2 are:

> The common law, as modified by constitutional and statutory law, judicial decisions and the condition and wants of the people, shall remain in force in aid of the general statutes of Oklahoma....

**40.** *Ascribing lawmaking consequences to some judicial work is not a new or revolutionary analysis.* Judges make law by common-law development; administrative tribunals make law by judicial rulemaking. The common-law development is a law-generating process that creates new legal norms. 2 Kenneth Culp Davis and Richard J. Pierce, Jr., ADMINISTRATIVE LAW TREATISE § 10.6, at 154 (3d ed.1994); Kenneth Culp Davis, *Judicial Notice*, 55 Colum. L.Rev. 945, 952 (1955) ("When a court or agency develops law or policy, it is acting legislatively; the courts have created the common law through judicial legislation...."). Judicial actions may fall under three rubrics—adjudicative, legislative and executive. The U.S. Supreme Court applies a functional test to immunity questions. When judges adjudicate they have absolute immunity; when they legislate they have legislative immunity and when they act as executives, they have only executive immunity. In *Supreme Court of Virginia v. Consumers Union of the United States*, 446 U.S. 719, 731, 100 S.Ct. 1967, 1974, 64 L.Ed.2d 641, 653 (1980), the Court pointed out that protection from liability under the Civil Rights Act is extended to one whose *performed function* under attack is found to be immunized rather than on the basis of one's official place as a functionary in an assigned category of government service. The Court observed that "[i]t *is evident that, in enacting disciplinary rules, the Supreme Court of Virginia is constituted a legislature." Id.* (emphasis supplied). *Cf. Forrester v. White*, 484 U.S. 219, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988).

common law and that of concretizing the textual meaning of statutory and constitutional law is known as **interstitial lawmaking by adjudication.**[41] **Today's change in the extant statutory jurisprudence constitutes the court's act of lawmaking through adjudication by refining (concretizing) the meaning to be placed on the substantive-law content of a legislative enactment.**

## B.

### All Forms of Non-legislative Lawmaking must Conform to the Constitution's Restrictions on Retroactive Enactments

¶ 22 Legitimate judicial lawmaking by adjudication is not exempt from constitutional testing. Like legislation itself, it must pass the fundamental law's muster.[42] *Walls* and *Patterson*[43] are both acts of legitimate judicial lawmaking that fall under the constitutional restraints on the effect of after-enacted legislation. **These pronouncements amend for this case, in a substantive manner, the earlier-declared meaning of, and consequences flowing from, the Act.** They are contrary to the extant statutory law finally proclaimed by *Tibbetts I.* **Although I do not recede from the court's current commitment to *Walls* and *Patterson*, I cannot**

accede to the view that these pronouncements may be applied to this cause.

¶ 23 Today's opinion sanctions a **particularly reprehensible form of retroactive judicial lawmaking**—one that wipes out adjudged rights by a mid-stream change in a legislative text's meaning. **The court abolishes the unharmed plaintiffs' finally declared right of private action, which also entitles the prevailing party to a counsel-fee award as an additional element of its recovery.** **Both of the issues in contest here—the actionable character of the private action and the plaintiffs' entitlement to a counsel-fee award in post-remand proceedings—were finally settled by *Tibbetts I* in favor of the plaintiffs.** Their actionable claim, abrogated today, **arose *before* the court's statutory norm change.** *Tibbetts I* **remains the only effective law for this case. This is so because it stands undisturbed as well as final by certiorari's denial.**

¶ 24 Every retrospective change in the law produces "injustice"—losers become winners and vice versa; *nay*, after-crafted statutory jurisprudence, when retrospectively applied, may be perceived by some as an instrument of injustice.[44] It violates the process that is everyone's due. I cannot join the court's

---

41. The U.S. Supreme Court recognizes some facets of *judicature* as *consequential lawmaking.* *Linkletter v. Walker,* 381 U.S. 618, 623–24, 85 S.Ct. 1731, 1734, 14 L.Ed.2d 601 (1965), presented the question whether the exclusionary rule of *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), should be held to operate *retrospectively* by including within its sweep final convictions before the *Mapp* decision. In declining to apply *Mapp* retroactively, the Court explicitly repudiated the universal applicability of the Blackstonian view that courts declare only preexisting law and, instead, adopted the positivist approach counseled by John Austin "that judges do in fact do something more than discover law; they make it *interstitially by filling in* with judicial interpretation the vague, indefinite, or generic statutory or common-law terms that alone are but the empty crevices of the law." *Id.,* 381 U.S. at 623–24, 85 S.Ct. at 1734 (emphasis added). "I recognize without hesitation," wrote Justice Holmes in 1917, "that judges do and must legislate, but they can do so only *interstitially.*" *S. Pac. Co. v. Jensen,* 244 U.S. 205, 221, 37 S.Ct. 524, 531, 61 L.Ed. 1086 (1917)(Holmes, J., dissenting)(emphasis added). Sir Rupert Cross observes that "[t]he modern English judge is at a disadvantage

as a lawmaker when contrasted with the legislature because he cannot unmake law which has been effectively declared by statute, or, in spheres in which there is no statute, by decisions which are binding upon him. He is subject to the even greater restriction that he can only make law on such specific issues as happen to be litigated before him." *Rupert Cross, supra* note 27 at 34. "*[I]t is only necessary to observe that the fact that our judges can and do make law is now universally recognized by writers on the British Constitution.*" *Id.,* at 30 (emphasis supplied).

42. For the constitutional restraints against retroactive lawmaking see Parts IV through VII, *infra.*

43. *Supra* notes 4 and 5.

44. According to the legal philosophy of Professor Lon Fuller, who strove to isolate and catalogue the law's universally accepted *sine qua non* values, the function of law is to provide a mechanism for eliminating " 'the blind play of chance' by clear and understandable rules previously declared and consistently applied." Lon L. Fuller, THE MORALITY OF LAW 9 (2d ed.1969). He maintains that "a retroactive law is truly a monstrosi-

refusal to afford the plaintiffs the protections conferred upon them by the Oklahoma Constitution [45] against retroactive application of after-promulgated changes in statutory jurisprudence. Inasmuch as the retrospective effect given today's pronouncement destroys rights protected by Art. 5 §§ 52 and 54, Okl. Const.,[46] I would hold that the after-promulgated jurisprudential change in substantive statutory norms cannot be applied to this claim which had "accrued" and in which "proceedings [stood] begun" **before** the rule change. It is fundamentally unfair [47] to deprive the plaintiffs of their constitutionally protected accrued rights,[48] declared by COCA in *Tibbetts I* and left undisturbed to become final by this court's election not to disturb them on certiorari review.[49] **In short, I would make the application of today's change in the meaning of statutory text conform to the constitution's mandate against retroactive lawmaking.**

## V

### THE COURT IGNORES AND VIOLATES THE PROVISIONS OF OKLAHOMA'S CONSTITUTION WHICH REQUIRE THAT THE SUBSTANTIVE LAW TO BE APPLIED IN LITIGATION PROCESS MUST BE THAT WHICH WAS IN FORCE WHEN THE PROCEEDINGS WERE BEGUN

¶ 25 Retrospective overruling of the settled law of the case by after-enacted legislative changes **(or those effected through the process of judicature)** offends the explicit constitutional barrier to changing the applicable norms of substantive law for a **proceeding begun** earlier than the effected change. Art. 5 § 54, Okl. Const.[50]

¶ 26 One cannot deny that for application to the Tibbetts claim the statutory law to

---

ty. Law has to do with the governance of human conduct by rules. To speak of governing or directing conduct by rules that will be enacted tomorrow is to talk in blank prose." *Id.* at 53. Fuller equates retroactive legislation with the "brutal absurdity of commanding a man today to do something yesterday." *Id.* at 59. He argues that laws must have an "internal morality" which is reflected in eight constitutive elements of legality. *Prospectivity (i.e. nonretroactivity) of legal rules is one of the eight elements. He urges that no system that applies after-enacted law retrospectively can aspire to be just under the standards he proposes for natural law.*

**45.** See the pertinent terms of Art. 5 §§ 52 and 54, Okl. Const., *infra* notes 56 and 50.

**46.** For the pertinent terms of Art. 5 §§ 52 and 54, Okl. Const., see *infra* notes 56 and 50.

**47.** "Retroactive legislation presents problems of unfairness that are more serious than those posed by prospective legislation, because it can deprive citizens of legitimate expectations and upset settled transactions. For this reason, '[t]he retroactive aspects of [economic] legislation, as well as the prospective aspects, must meet the test of due process': a legitimate legislative purpose furthered by rational means." *General Motors Corp. v. Romein*, 503 U.S. 181, 191, 112 S.Ct. 1105, 1112, 117 L.Ed.2d 328 (1992).

**48.** The U.S. Supreme Court acknowledges the existence of some federal constitutional protection for a vested interest. In *Stogner v. California*, — U.S. —, —, 123 S.Ct. 2446, 2460, 156 L.Ed.2d 544 (2003), the Court opines "that an extension of even an expired civil limitations

period can unconstitutionally infringe upon a 'vested right.' " *Id.*, citing *Chase Securities Corp. v. Donaldson*, 325 U.S. 304, 312, n. 8, and 315–316, 65 S.Ct. 1137, 89 L.Ed. 1628 (1945).

**49.** In English law, a *per incuriam* decision is one given in ignorance or forgetfulness of a statute or of a rule having the force of law. The English Court of Appeal is not bound by its decisions given *per incuriam. Rupert Cross, supra* note 27 at 121, 148–51, 163; *Huddersfield Police Authority v. Watson*, 2 All E.R. 193, 196 (1947); *Young v. Bristol Aeroplane Co. Ltd.*, K.B. 718, 729 (Eng.C.A.1944). Assuming this English doctrine is a part of Oklahoma law, *Tibbetts I* is not vulnerable to a declaration that it is a *per incuriam* pronouncement. No one asked on remand that *Tibbetts I* be declared *per incuriam;* but even if the doctrine had been invoked, the fact that this court has later chosen to pursue a different course of construction is not a ground for pronouncing an opinion *per incuriam.* Moreover, since *Tibbetts I* is a COCA pronouncement that has not been approved as precedential by the Supreme Court, it is not subject to a *per incuriam* condemnation.

**50.** The terms of Art. 5 § 54, Okl. Const., are:

The repeal of a statute shall not revive a statute previously repealed by such statute, nor shall such repeal affect any **accrued right,** or penalty incurred, or **proceedings begun** by virtue of such repealed statute.

(emphasis added).

A proceeding begun under applicable norms of substantive statutory law (or common law) then in force remains unaffected by after-enacted leg-

govern the case has been changed; whether the change was effected by an appellate pronouncement or by a legislative enactment is immaterial. **It is the change—jurisprudential or legislative, by enactment or adjudication—that falls clearly under the axe of constitutional condemnation for after-the-fact lawmaking.** Today's retroactive application of substantive-law changes in the controlling statutory norm that stood declared for this claim in *Tibbetts I* offends the constitution's expressed solicitude for continued and evenhanded application of the law in force when the proceeding was begun.

¶ 27 **This proceeding was begun when the unharmed plaintiffs still enjoyed a private right of action for the Act's violation and the fruits of their judicially declared status as prevailing parties in the case. Today's opinion destroys the rights declared in their behalf by COCA's *Tibbetts I*.**

## VI

## THE COURT IGNORES AND VIOLATES THE PROVISIONS OF THE OKLAHOMA CONSTITUTION WHICH REQUIRE THAT "ACCRUED RIGHTS" NOT BE DISTURBED BY AFTER-ENACTED LAW

¶ 28 When the *Tibbetts I* phase of this litigation came to an end by this court's denial of certiorari (and by the issuance of its mandate), the applicable and effective statutory norm of Oklahoma's substantive law unquestionably gave the unharmed plaintiffs a private cause of action for a *mere (harmless) violation* of the Act. Their status as prevailing party, which entitled them to a counsel-fee award, stands pronounced by COCA's *Tibbetts I*.[51] **That declaration, when final, became the plaintiffs' constitutionally protected accrued right.[52] COCA's holding in *Tibbetts I* has retroactive effect by force of common law and this court chose not to disturb its terms on certiorari.** After-passed legislative enactments (or after-promulgated caselaw) can neither destroy nor alter these rights.[53] To hold otherwise would undermine the constitutionally shielded concept of an "accrued" right in an **adjudicated** claim.

¶ 29 All these principles are rejected by today's pronouncement. The private claim is now abolished and gone with the winds is also the plaintiffs' declared entitlement to an attorney's fee. Responsible for the private claim's surprising and sudden demise is this court's after-promulgated pronouncement that construes the Act in two unrelated law-

islative changes (or those effected through the process of judicature). In *First Nat. Bank of Pauls Valley v. Crudup*, 1982 OK 132, 656 P.2d 914, the court dealt with an enactment that operated to abridge a limitation period governing foreclosure of certain mechanic's or materialmen's liens. A lien statement timely filed (pursuant to a then-existing statute) was held to constitute a "proceeding begun" whose limitation could not be shortened by an after-enacted statute without offending the provisions of Art. 5 § 54, Okl. Const.

51. One's entitlement to a counsel-fee award as prevailing party brings to a litigant an added element of postjudgment recovery, which, on its attachment, becomes "an accrued right" that stands protected by Art. 5 § 54, Okl. Const.

52. *Accrued right,* as used in Art. 5 § 54, Okl. Const., may be defined as a *matured cause of action* that arose before there was a change in law. *In re Bomgardner*, 1985 OK 59, ¶ 11 n. 22, 711 P.2d 92, 96 n. 22; *Mid–Continent Casualty Co. v. P & H Supply, Inc.*, 1971 OK 135, ¶ 16, 490 P.2d 1358, 1361; *Barry v. Board of County Commissioners*, 1935 OK 701, 49 P.2d 548, 549, 173 Okl. 645. BLACK'S LAW DICTIONARY 1323 (7th ed.1999) defines an "accrued right" as a "matured right; a right that is ripe for enforcement." "A *'vested right'* is the power to do certain actions or possess certain things lawfully, and is substantially a property right. It may be created either by common law, statute or contract. *Once created, it becomes absolute, and is protected from legislative invasion by Art. 5, Secs. 52 and 54 of our Constitution.*" *Oklahoma Water Resources Board v. Central Oklahoma Master Conservancy District*, 1968 OK 73, ¶ 23, 464 P.2d 748, 755 (emphasis added).

53. *Lee v. Volkswagen of America, Inc.*, 1987 OK 80, ¶ 3, 743 P.2d 1067 (one's entitlement to an award of costs is a vested right in an adjudicated obligation and cannot be altered by legislation enacted after the judgment); *Timmons v. Royal Globe Insurance Co.*, 1985 OK 76, ¶ 13, 713 P.2d 589, 594.

suits,[54] disposed of by opinions that do not even note the earlier-published authority of *Tibbetts I* as having been relegated to the status of ineffective caselaw. If the solution embraced by the court today is not a constitutionally impermissible death sentence for one's "accrued right," no vested interest will ever be safe from after-the-fact destruction by judicial fiat dealt through jurisprudence of pure afterthought.[55]

¶ 30 **When this action was brought the unharmed plaintiffs had a right to bring a private claim for a violation of the Act. That right, together with all of its declared ancillary incidents, is destroyed by today's opinion.**

**54.** *See Walls* and *Patterson, supra* notes 4 and 5.

**55.** The court's pronouncement in *Qualls v. Farmers Ins. Co., Inc.,* 1981 OK 61, 629 P.2d 1258 is not inconsistent with the dissent's analysis that *in this case we deal with substantive law. Qualls* dealt only with an after-enacted statute that added a counsel-fee award to a pending claim. Here, we are dealing not with just one's entitlement to a counsel-fee award by an after-enacted statute, but with the survival of a claim that confers upon the prevailing party a declared right to a counsel-fee recovery. In short, *Qualls* was pronounced on the basis of the statute's purely procedural impact. In this case we deal with the pronounced actionability of a claim (declared viable in *Tibbetts I* ), which presents an issue of substantive law.

**56.** The terms of Art. 5 § 52, Okl. Const., are:
The Legislature shall have no power to revive any right or remedy which may have become barred by lapse of time, or by any statute of this State. *After suit has been commenced on any cause of action, the Legislature shall have no power to take away such cause of action, or destroy any existing defense to such suit.*
(emphasis added).
Neither the legislature nor the courts can impair a substantive right by retrospective legislation or by after-promulgated judicature. *Hedges v. Hedges,* 2002 OK 92, ¶ 26, 66 P.3d 364, 374 (the validity, meaning, and effect of a judgment must always be assayed by the law in force at the time it was entered; judicial testing of these elements in an adjudged obligation must be kept free from impairment by after-enacted legislation and by after-promulgated caselaw); *Nantz v. Nantz,* 1988 OK 9, ¶ 6, 749 P.2d 1137, 1143 (Opala, J., dissenting); *Harry R. Carlile Trust v. Cotton Pe-*

# VII

## SUBSTANTIVE CHANGES IN LAW CANNOT BE RETROACTIVE IN EFFECT

¶ 31 Substantive rights may not be changed mid-stream for application to a *claim* or defense in a pending judicial proceeding. Art. 5 § 52, Okl. Const.[56] Plaintiffs' standing *(locus standi )* [57] to press their private claim for a harmless violation of the Act, accorded by *Tibbetts I,* is a substantive right. Their entitlement to a counsel fee as a prevailing party explicitly stands attached to that claim (by *Tibbetts I* declaration) as an additional element of recovery.[58] **Claims that have accrued before the law is changed are protected from both legislative and judicial extinguishment.[59] The plaintiffs are clearly entitled in this case to an application of that pre-existing, con-**

*troleum Corp.,* 1986 OK 16, ¶ 24, 732 P.2d 438, 449; *Timmons v. Royal Globe Ins. Co.,* 1985 OK 76, ¶ 13 n. 18, 713 P.2d 589, 594 n. 18; *Mayhue v. Mayhue,* 1985 OK 68, ¶ 6, 706 P.2d 890, 894; *American-First Title & Trust Company v. Ewing,* 1965 OK 98, ¶ 40, 403 P.2d 488, 496.

**57.** The term *"locus standi "* means "the right to bring an action or to be heard in a given forum." BLACK'S LAW DICTIONARY at 952 (7th ed.1999).

**58.** *When the measure of damages changes, the substantive law of the claim is changed.* The right to recover an attorney's fee as prevailing party is no less a matter of substantive law than recovery of damages for the harm occasioned by another. *An award of counsel fee to the victor, as an additional element of recovery, when statutorily authorized, "creates and enlarges substantive rights" in an action. Today's change in plaintiffs' right to recover counsel fee violates this constitutional mandate. Thomas v. Cumberland Operating Co.,* 1977 OK 164, ¶ 10, 569 P.2d 974, 976.

**59.** The provisions of Art. 5 § 54, Okl. Const., *supra* note 50. Rights are established in the states by their constitution, statutes or the common law. *Oklahoma Water Res. Bd., supra* note 52 at 755; *Smith v. Smith,* 1982 OK 115, ¶ 1 n. 1, 652 P.2d 297, 299 n. 1 (Opala, J., concurring). "A vested cause of action, whether emanating from contract or common-law principles, may constitute property beyond the power of the legislature to take away . . . ." *de Rodulfa v. United States,* 461 F.2d 1240, 1257 n. 96 (D.C.Cir.1972), cert. denied, 409 U.S. 949, 93 S.Ct. 270, 34 L.Ed.2d 220 (1972).

trolling and undisturbed norm of substantive statutory law which was declared for their claim in Tibbetts I.[60]

¶ 32 Today's pronouncement does more than destroy the plaintiffs' right to a counsel fee by force of an after-enacted law; it affects the plaintiffs' *locus standi* by entirely abolishing their claim. That includes not just one but all the elements of recovery. In short, a substantive norm of statutory law underwent a change by after-promulgated jurisprudence. It is that changed norm which the court applies to this claim today.

¶ 33 **The retrospective repudiation of** *Tibbetts I* **clearly violates the constitutionally anchored restrictions on the government's power retroactively to change substantive law either by judicature or by legislative enactment. I cannot accede to the court's act of attempting to right its self-perceived error by extra-legal means.[61]**

¶ 34 **When this action was brought the unharmed plaintiffs had standing to bring a private action for a violation of the Act and to receive a counsel-fee award as a declared prevailing party. Their claim is declared actionable by** *Tibbetts I.* **Their entitlement to a counsel-fee award is also pronounced by that final authority. It is a substantive right that is abolished by today's retroactive application of after-crafted jurisprudential change in the statutory text's meaning.**

## VIII

## REPLY TO THE COURT'S CRITIQUE OF THE DISSENT

¶ 35 The court chooses to ignore the undeniable fact that its post-*Tibbetts I* abolition of an unharmed plaintiff's private right of action **makes today's pronouncement a retroactive destruction of an accrued right.** A substantive right conferred by a judicial act that is recognized as bearing the attributes of finality constitutes an accrued right. No amount of rhetoric can sidetrack this verity. *It is the plaintiffs' private claim, not the attorney's fee, that is here at stake.*[62] Had the claim survived today's opinion, plaintiffs' entitlement to a fee award might have continued as an issue to be dealt with. It is the demise of the private claim that extinguishes and removes from the case *all other issues.*

¶ 36 The court's reference to the defendant's liability-defeating defenses against the fee quest is equally inapposite.[63] Because the plaintiffs' private claim is dead under the axe of *Walls, Patterson* and of this court's *Tibbetts II*, nothing can make the fee quest viable again. There can be no counsel-fee award *in abstracto*. **It must be attached to an adjudicated claim that is still in existence.** The fee question died with the demise of the plaintiffs' private cause of action.

¶ 37 There are two parallel rules that stand in contradiction of one another which have **co-existed since early statehood:** one that is absolutely obedient to the **settled law of the case without any exceptions**[64] and

---

**60.** *Thomas, supra* note 58, teaches that a statutory increase in the quantum of damages recoverable in a contract action fashions "a new element of damages as distinguished from [creating] a new remedy...." *Id. at* ¶ 6, at 976. The issue in *Thomas* was whether the statutory increase in wrongful death benefits may be applied retroactively. This court held that "[s]tatutory increases in damage limitations are changes in substantive rights and not mere remedial changes." *Id.* For *Thomas'* progeny see *Roach v. Jimmy D. Enterprises, Ltd.,* 1996 OK 26, 912 P.2d 852; *Majors v. Good,* 1992 OK 76, 832 P.2d 420 (statutory increases or restrictions on the quantum of recoverable damages are changes in substantive rights that must be applied prospectively only).

**61.** Extra-legal means are those which are not prescribed by law for the relief sought.

**62.** By its reference to the right of counsel-fee award the court is building a railroad siding to escape from the main track. See ¶ 24, note 16 of the court's opinion. What is destroyed by today's retroactive jurisprudence is the private right of action by an unharmed plaintiff.

**63.** The court's critique focuses on a contingency-fee defense. That theory could have been raised in *Tibbetts I.* It is now barred by the settled law of the case. *Nealis, supra* note 18, at ¶ 61, at 462; *Handy, supra* note 18, at ¶ 13, at 873 (the settled-law-of-the-case doctrine operates to bar relitigation of issues that are finally settled by an appellate opinion *as well as of those that the aggrieved party has failed timely to raise in the course of appellate contest* ).

**64.** *See, e.g., Dixon v. State Mut. Ins. Co.,* 1916 OK 738, ¶¶ 0, 8, 159 P. 922, 60 Okl. 237 ("It is the

the other which allows an open-ended escape hatch.[65] Obedience to these parallel rules is dictated solely by the court's unrestrained choice. That alone condemns the latter rule as a vehicle for the court's whimsical choosing rather than for its reasoned application of the law.

¶ 38 For support of its reliance on the open-ended escape hatch from settled law the court invokes the longevity of the authority for today's departure. Suffice it to say that " '[i]t is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past.' " [66] Sound legal reasoning will not sustain a rule whose time of usefulness has passed.

¶ 39 The court attempts to justify its abandonment of settled law by invoking the "palpably erroneous" test. The latter is as vacuous and standardless as "manifest injustice." [67] It says nothing about the degree of error that must be exceeded before it can be invoked. In applying this test the court is utterly free to find any error palpably erroneous. The test—a mere verbal camouflage—serves as a *carte blanche* for total judicial freedom from the norms of precedent.

¶ 40 If a decision is indeed palpably erroneous, the time to correct it is not **after** relitigation is barred by the command of issue preclusion, but rather when a petition

for certiorari is still under timely review.[68] **The plaintiffs should not be punished for this court's earlier inaction.**

¶ 41 The court has impermissibly overextended its power to grant corrective relief upon timely-brought certiorari quest. The second bite it gives the loser today lies clearly on a collision course with constitutional restraints on retroactive lawmaking either by legislation or adjudication. It brazenly contravenes the standards of issue preclusion which stand incorporated into the body of Oklahoma law from the norms of Restatement of Judgments (Second) § 27 and from the Restatement's recent exposition in the U.S. Supreme Court jurisprudence.

## IX

### SUMMARY

¶ 42 Any departure from *settled law* or from the doctrine of *issue preclusion may be authorized solely upon a court's determination* that, before its settlement, the issue was not *fully and fairly litigated.* When one invokes the empty and shapeless yardstick of *"justice,"* one measures legal rights by personal predilection rather than by a fixed gauge of the law.

¶ 43 The *"injustice"* from which the court saves the defendant was occasioned by this court's (a) *failure to provide relief* to the defendant when certiorari was sought in *Tibbetts I* and (b) *retroactive destruction of the settled law of the case through applying to*

---

general rule that a decision upon a general demurrer to a petition, when the party elects to stand upon the petition, is a ruling upon the merits and is res adjudicata as between the parties upon the same state of facts, but in a case where the Supreme Court sustains the trial court solely upon the ground that the petition was prematurely filed, such holding is binding upon the trial court, and **it is immaterial that the Supreme Court has since held that the same state of facts constitutes a good cause of action.").** *Id.,* ¶ 0 (emphasis added). The command of *Dixon's* **unqualified obedience** to settled law has been consistently and often followed. It remains unrepudiated.

**65.** *See, e.g., Oklahoma City Elec., Gas & Power Co., supra* note 29, at ¶ 9, at 760–61.

**66.** *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 420, 91

S.Ct. 1999, 2016, 29 L.Ed.2d 619 (1971) (Burger, C.J., dissenting) (quoting Oliver Wendell Holmes, *The Path of the Law,* 10 Harv.L.Rev. 457, 469 (1897)).

**67.** Employment of vacuous legal standards is counterproductive to developing a body of reasoned decisions with concretized and consistent norms of precedential value which are so necessary for a judicature that assures everyone of even-handed fairness.

**68.** The court fails to address itself to the dissent's view that *Tibbetts I* raises an issue preclusive bar to the open-ended judicial escape hatch by which retroactive application of after-crafted changes in a once finally shaped norm of controlling statutory law is sought to be justified.

this claim after-crafted norms of substantive-law change in the meaning of a controlling statutory text.

¶44 Because this case deals with an issue of substantive law, the court's changed course for the intended meaning of the statute in question must conform to the constitution's expressed command that calls for *continued and evenhanded application of the law in force when a proceeding was begun* and for the *protection of accrued rights.* The efficacy of the substantive norm of statutory law pronounced for this case in *Tibbetts I* cannot be altered or impaired by after-promulgated jurisprudence that infuses a contrary or different meaning.

¶45 **Today's rejection of a jurisprudential norm** declared for the statute's meaning at the time the claim accrued and **the retrospective application of the changed norm to this case** destroy rights protected by Art. 5 §§ 52 and 54, Okl. Const. **I would not apply to this claim the court's changed meaning of the Act.**

¶46 In today's pronouncement I would go no further than reiterate, as the court does, our continued commitment to the reconcretized norm of the Act's meaning that was crafted in *Walls* and *Patterson,* but, contrary to the court's holding, I would leave undisturbed the law finally settled for this case by COCA's *Tibbetts I* and now shielded from retroactive rule change by both legislative and judicial after-the-fact tinkering. The defendant's proposal for a justice-invoking resolution of this certiorari proceeding, which so plainly violates the state constitution's protection against applying after-crafted substantive-law changes, cannot escape judicial condemnation. **It is positively destructive and illegal.** I hence recede from that part of today's opinion which retroactively thrusts into this case norms re-engineered after COCA's *Tibbetts I* settlement of the law that was to govern on remand.